IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 7, 2017

## SHAUN TALIAFERRO v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Haywood County**
**No. 6740     Clayburn Peeples, Judge**

### No. W2017-00138-CCA-R3-PC

The petitioner, Shaun Taliaferro, appeals the denial of post-conviction relief from his 2013 Haywood County Criminal Court jury convictions of second degree murder and possession of a firearm by a convicted felon, for which he received an effective sentence of 44 years. In this appeal, the petitioner contends that he was denied the effective assistance of counsel at trial. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Rachele Gibson, Assistant District Public Defender, for the appellant, Shaun Taliaferro.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Hillary Parham and Jason Scott, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Haywood County Grand Jury charged the petitioner with one count each of first degree premeditated murder and possession of a firearm by a convicted felon. Following a jury trial, the petitioner was convicted of the lesser-included offense of second degree murder and was convicted as charged of being a felon in possession of a firearm, and the trial court imposed an effective sentence of 44 years' incarceration. This court affirmed the convictions and sentences on direct appeal. *See State v. Shawn O'Neal Taliaferro*, No. W2013-01620-CCA-R3-CD (Tenn. Crim. App., Jackson, Nov. 24, 2014), *perm. app. denied* (Tenn. Mar. 13, 2015).[1]

---

[1]     Although the petitioner's first name was spelled "Shawn" in this court's opinion on direct appeal,

The evidence adduced at the petitioner's trial established that the victim, David Lee Capers, was the best friend of Kendell Turner. *Id.*, slip op. at 1, 3. On September 3, 2010, the victim and Mr. Turner were attending a gathering where both the petitioner and Joseph Vaughn were present. *Id.*, slip op. at 3, 4. At some point, the four men left the gathering in Mr. Turner's mother's van to visit the victim's sister and to patronize a liquor store. *Id.* After leaving the liquor store, the men drove toward the victim's mother's residence. *Id.* Mr. Turner was driving, the victim was seated in the front passenger seat, the petitioner was seated directly behind the victim, and Mr. Vaughn was seated directly behind Mr. Turner. *Id.* Mr. Turner then described what happened next as he was driving on Highway 19 toward Brownsville:

> [T]he victim was talking about his life in Decatur, Illinois, and showing pictures of his baby when Mr. Turner heard a "pow" like someone had "slapped [the victim] in the head." Mr. Turner stated that upon hearing the "loud clap noise" he reflexively applied the car brakes. He looked over at the victim, who was slumped over, and saw blood coming from the right side of the victim's head. He said that he saw the [petitioner] pulling "[a] little chrome gun" away from the victim's head.

> Mr. Turner testified that he continued driving and then heard a gun fired multiple times. He applied the brakes again slowing the van, and the victim jumped out of the van. Mr. Turner recalled that the [petitioner] stated "y'all know what this mother f**ker did to me." He said that he believed the [petitioner] was referencing "bad blood" between the victim and [the petitioner]. In response to the victim's flight, the [petitioner] said "f**k that mother f**ker ain't dead," and he ordered Mr. Turner to stop. Mr. Turner said that he turned the van around and headed back toward Ripley telling the [petitioner] that the victim was dead. The [petitioner] continued to tell Mr. Turner to stop the van. Mr. Turner did not stop and continued driving back toward Ripley while the [petitioner] searched for bullets or shells in the van. The [petitioner] told Mr. Turner to explain the blood in the van to his mother by saying that the victim had borrowed the car.

both his original indictment and his petition for post-conviction relief indicate that his first name is spelled "Shaun."

Mr. Turner testified that he assured the [petitioner] he would not "tell on [him]" and told the [petitioner] he "just want[ed] to get out." Mr. Turner stopped the car, he and [Mr.] Vaughn exited the van, and the [petitioner] drove away. Mr. Turner stated that he never saw the van again but that he was told that "it got burnt up." Mr. Turner said that one of Mr. Vaughn's relatives came and picked up him and Mr. Vaughn, and that he later went to the police about the shooting.

*Id.*, slip op. at 3-4.

Mr. Vaughn testified similarly about the events leading up to the shooting. *Id.*, slip op. at 4. Of the shooting, Mr. Vaughn testified as follows:

He recalled that as they drove down Highway 19, they talked and listed to the radio, "normal stuff," when the [petitioner] shot the victim. He said the [petitioner] fired one or two shots at first, followed by five or six more gun shots. Mr. Vaughn stated that he observed the [petitioner] firing the gun and that he threw up his hands because he "didn't know what was going on."

Mr. Vaughn testified that he asked the [petitioner] what he was doing, and the [petitioner] replied that the victim had "crossed him." Mr. Vaughn said that he believed the [petitioner] was referring to an incident that occurred in Illinois in 2008. He confirmed that he observed the victim bleeding from his head. After the first round of gunfire, the victim was "slumped over on the window." Mr. Vaughn said that the victim turned around and asked the [petitioner] why [he] shot him and that the [petitioner] then fired the gun for the second time at the victim. The victim and the [petitioner] wrestled over the gun and then the victim opened the van door and "fell out." Mr. Vaughn said that the van was moving at the time the victim exited but not "very fast." He said that Mr. Turner was crying and driving at the time. He described Mr. Turner as "in shock." Mr. Turner turned the van around at his next opportunity and began to drive back to Ripley. Mr. Vaughn said that the [petitioner] wanted Mr.

Turner to stop the van to find the victim but that Mr. Turner did not stop.

Mr. Vaughn testified that, once they arrived in Flippin, Mr. Vaughn and Mr. Turner "jumped out and ran." Approximately twenty minutes after he and Mr. Turner fled from the van, the [petitioner] called Mr. Vaughn's cellular telephone to ask where Mr. Turner was. He said that he and Mr. Turner waited on the side of the road until his cousin, Lester, came to get them.

Mr. Vaughn testified that he observed the [petitioner] shooting "toward the [victim's] face area." He said that the [petitioner] fired the gun until he ran out of bullets.

*Id.*, slip op. at 4-5.

The victim's sister, Ashley Allen, testified that the victim, the petitioner, Mr. Turner, and Mr. Vaughn had visited her briefly on September 3, 2010. *Id.*, slip op. at 5. Through Ms. Allen's testimony, the State introduced into evidence a photograph Ms. Allen took of the four men seated in a white van on the day in question and showing their seated positions within the van. *Id.*

Lauderdale County Sheriff's Department ("LCSD") Deputy William Whitson interviewed Mr. Turner on September 3 at the Ripley Police Department, where Mr. Turner reported that the petitioner had shot the victim twice in the head. *Id.*, slip op. at 2. Tennessee Bureau of Investigation ("TBI") Special Agent Cathy Ferguson assisted in the investigation and testified that the victim's body had been located approximately 30 feet from Highway 19, just over the Lauderdale County line into Haywood County and at the end of an intermittent, 72-foot-long trail of blood. *Id.*, slip op. at 5. During the course of her investigation, Agent Ferguson learned that the LCSD had "received a report of a van on fire in a field in Lauderdale County" at approximately 10:20 p.m. on September 3 and that the owner of the van was Mr. Turner's mother. *Id.* Because the van was "'basically incinerated,'" Agent Ferguson was able to identify "nothing . . . of 'evidentiary value'" except a cartridge casing in the front passenger area. *Id.*

Agent Ferguson interviewed the petitioner on September 4. *Id.*, slip op. at 6. After Agent Ferguson provided the petitioner with his *Miranda* warnings and the petitioner executed a written waiver of his rights, the petitioner, although "'very agitated,'" initially "denied any involvement in the victim's death or recently having seen the victim." *Id.* The petitioner then "admitted to having seen the victim on September 3,

- 4 -

2010" and stated that "he, the victim, and Mr. Turner drove around in Mr. Turner's mother's van." *Id.* According to the petitioner, the group "went to Paul Haynes's house and the victim's sister's home before he was dropped off at his home between 8:00 and 9:00 p.m." *Id.* When Agent Ferguson informed the petitioner that she did not believe him, the petitioner "became 'very aggravated' and 'upset,' requesting to be returned to his jail cell." *Id.*

With respect to cellular telephone activity on the night in question, Agent Ferguson testified that the last activity on the victim's cellular telephone was at 7:41 p.m. *Id.* The petitioner received a call at 7:25 p.m., and there was no activity on his telephone until 8:15 p.m. when he placed a call. *Id.* Records showed that the petitioner called Mr. Turner at 8:20 p.m. and Mr. Vaughn at 8:27 p.m. *Id.*

> Agent Ferguson said that, in reviewing the telephone records, she also noted a significant increase in phone calls from 8:15 p.m. until 10:20 p.m., when the van was found burning. She stated that, in her experience, when a crime has been committed there is either an increase in cell phone usage or gaps in cell phone usage. She explained that the gap in telephone usage from 7:25 p.m. to 8:15 p.m. was consistent with the time frame authorities believed the victim was shot and that the increased cellular telephone usage at 10:20 p.m. would be consistent with the [petitioner] needing to obtain a ride after burning the van in the field.

*Id.*

TBI Agent and Forensic Scientist Teri Arnie examined the cartridge case recovered from the van and six bullets recovered from the victim's body and determined that all were .25 caliber. *Id.* TBI Agent and Forensic Scientist Robert P. Miles performed a gunshot residue primer analysis on the petitioner's clothing and found "the presence of particles unique to gunshot primer residue" on the petitioner's hat, which would indicate that the hat "was near a gun when it was fired or came into contact with a recently fired gun." *Id.*, slip op. at 7.

Medical examiner Doctor James Caruso testified that the victim had been shot six times and identified two contact wounds, "one to the victim's temple and one to the victim's forehead." *Id.*, slip op. at 2. Doctor Caruso believed that the victim "could have had some ability to move after being shot prior to his death," given the location of the head wounds. *Id.* Doctor Caruso opined that the cause of the victim's death was the two gunshot wounds to the head and that the manner of death was homicide. *Id.*

A Decatur, Illinois police detective testified that he had investigated an October 2007 "shooting crime involving the victim and the [petitioner]," in which the victim later identified the petitioner as the shooter. *Id.*, slip op. at 7. The petitioner was eventually convicted of an Illinois felony. *Id.*

The trial court admitted into evidence a certified copy of the petitioner's prior conviction of aggravated assault in Lauderdale County in support of his charge of possession of a firearm by a convicted felon. *Id.*

Markee Barbee testified on behalf of the petitioner and stated that he had encountered the petitioner "on 'Eddie's porch' 'right at dark'" on the evening of September 3, and that the two men attended a street festival in Halls until 10:00 or 10:30 p.m. *Id.*, slip op. at 7. Jennifer Moody testified that she drove the petitioner's wife home from church on the night of September 3, arriving shortly after 11:00 p.m., and that the petitioner was in his yard at that time working on a vehicle. *Id.*, slip op. at 7-8.

On June 17, 2015, the petitioner filed, pro se, a timely petition for post-conviction relief, alleging, *inter alia*, that he was deprived of the effective assistance of trial counsel. Following the appointment of counsel and the amendment of the petition, the post-conviction court conducted an evidentiary hearing on December 5, 2016.

At the evidentiary hearing, the petitioner stated that he had retained trial counsel to represent him in December 2010 and that he had requested that counsel hire an investigator to "look into the case" for him but that counsel had failed to do so and had also failed to locate additional alibi witnesses. The petitioner testified that trial counsel met with him on five total occasions, only one of which occurred during the two months prior to trial, and that counsel failed to return his telephone calls or respond to his letters.

The petitioner stated that trial counsel failed to cross-examine Mr. Turner and Mr. Vaughn about the fact that the two were first cousins, a fact that the petitioner believed would have been important to show bias. With respect to prosecutorial misconduct, the petitioner testified that the prosecutor, during his rebuttal argument to the jury, had stated that the lack of blood or gunshot residue on the petitioner's clothing had been due to the petitioner's having changed clothes and thrown his incriminating clothing into the burning van on the night in question. According to the petitioner, however, this evidence had never been presented to the jury, and trial counsel failed to object to these statements by the prosecutor.

Trial counsel testified that he represented the petitioner for just over four years, having met with the petitioner on "at least 10" occasions and having used the

services of Investigator Tim Norris. Trial counsel testified to significant efforts made to secure the testimony of two potential alibi witnesses but that one witness refused to cooperate due to federal drug charges he was facing and that the facts as described by another witness changed enough that counsel was concerned that his testimony would "do far more harm than good." Regarding his failure to cross-examine Mr. Turner and Mr. Vaughn about their familial relationship, trial counsel stated that he recalled that "everybody was cousins with everybody" and that the petitioner had told him that the victim was his cousin, asking why he would "want to shoot [his] own cousin."

With respect to the issue of the prosecutor's referencing the petitioner's clothing during rebuttal argument, trial counsel stated that the victim's sister, Ashley Allen, had testified that the petitioner had been wearing a red shirt when he and the others visited her home on September 3 and that Ms. Allen had identified the petitioner in a photograph presented to the jury as the man wearing red. Trial counsel recalled that the petitioner had provided investigators with the clothing he had allegedly been wearing on September 3; that the clothing had included a white t-shirt and jeans; and that the petitioner's shirt, jeans, and shoes were all negative for gunshot residue, a fact trial counsel had stressed during his closing argument. During the prosecutor's rebuttal argument, he recalled that the prosecutor had referenced a photograph of the charred remains of the van and had pointed out to the jury the presence of a red shirt and blue jeans within the charred remains. When asked his opinion of this commentary by the prosecutor, trial counsel responded thusly:

> I don't remember what he said in his rebuttal. What I do know is this. I knew that photographic evidence and testamentary evidence had been introduced putting [the petitioner] in a red t-shirt. I also knew that there had been testimony from [Agent Ferguson] that there was absolutely no evidence – no items of evidentiary worth in that van, and so I made the decision that I did not want to call any attention to that red shirt, and so during my closing argument, I think if you look at the transcript my guess would be that I made no reference at all to that shirt, but I hammer home about the residue and I spent a good deal of time talking about Special Agent Ferguson and the absence of any worthwhile evidentiary items in the van. And, frankly – well, when the jury came back during deliberations with a question about the red shirt, my feeling was that there was something about the red shirt that was making them very unhappy and I wondered if maybe my closing argument focusing exclusively on the absolute lack of evidence that had been affirmatively testified

to with regard to the van, had perhaps punched a hole in the State's case and was causing the jury to have second thoughts or doubts.

The only other thing I remember is whatever question – they had a question about the shirt and I think His Honor chose not to answer it. That's what I remember about the closing.

With this evidence, the post-conviction court denied relief, finding no clear and convincing evidence that trial counsel had rendered ineffective assistance of counsel. In its detailed order denying relief, the court also made the following findings with respect to the petitioner's specific allegations of ineffective assistance of counsel:

The record in this proceeding established that counsel met with the [p]etitioner prior to Court on numerous times prior to trial, which is a significant number of times in that most of the work is not done in the client's presence.

It was clear that [trial counsel] and his staff did a great, great deal of work and thoroughly investigated to the exten[t] he could.

This Honorable Court finds that [trial counsel's] communication with the witnesses was unfeigned and extremely persistent; that [trial counsel] presented correct standards of competency, hours of trial preparation and thorough presentation; that [trial counsel's][2] response or lack thereof as to the non-mention of the evidentiary red shirt was precisely appropriate; and that the Petition and Amended Petition for Post Conviction Relief is hereby denied.

In this appeal, the petitioner reiterates his claim of ineffective assistance of counsel, claiming that trial counsel performed deficiently by failing to properly communicate with him, by failing to properly investigate his case, by failing to

---

[2] Although the post-conviction court's order refers to the "State's response or lack thereof," we believe that the court intended to refer to *trial counsel's* response, particularly when read in conjunction with the court's oral findings at the conclusion of the post-conviction hearing, in which the court stated that trial counsel's response to the State's mention of the red shirt in rebuttal argument "was right on target" and that "strategically he did exactly what he should have done."

sufficiently advocate for him, and by failing to object to the prosecutor's reference to the red shirt during rebuttal argument and to the trial court's failure to respond to the jury's inquiry about the red shirt. The State contends that the court did not err by denying relief.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn.

Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Kendrick*, 454 S.W.3d at 457; *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record fully supports the denial of relief in this case. The post-conviction court accredited trial counsel's testimony that he met with the petitioner on numerous occasions and "thoroughly investigated" the petitioner's case. Trial counsel's decision to avoid calling attention to the petitioner's red shirt and to instead focus on the lack of gunshot residue found on the clothing submitted to investigators for testing, as well as his belief that the familial relationship between witnesses was immaterial given the close familial relationship of the petitioner to the victim, was a reasonable trial strategy which we will not second-guess. *See Adkins*, 911 S.W.2d at 34. Given the overwhelming evidence against the petitioner, he cannot establish that, but for counsel's alleged errors, the outcome would have differed. *See Strickland*, 466 U.S. at 694. As such, we hold the petitioner has failed to prove by clear and convincing evidence any facts that demonstrate that trial counsel's representation was deficient or prejudicial.

The petitioner failed to establish that he was denied the effective assistance of counsel at trial. Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE